**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| THOMAS CROWTHER,<br><br>        Plaintiff,<br><br>v.<br><br>BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, MICHELE REED, SCOTT THORP, BENJAMIN HUTTON and BROOKS KEEL,<br><br>        Defendants. | Civil Action File No.:<br><br>_____<br><br>**Jury Trial Demanded** |

**COMPLAINT**

_____

Plaintiff, Thomas Crowther (hereinafter referred to as "Plaintiff"), submits his complaint against Defendants Board of Regents of the University System of Georgia ("Board of Regents" or "BOR"), Michele Reed ("Reed"), Scott Thorp ("Thorp"), Benjamin Hutton ("Hutton"), and Brooks Keel ("Keel") (hereinafter collectively referred to as "Defendants") respectfully alleges as follows:

**THE NATURE OF THE ACTION**

1.     This action arises out of the wrongful and unlawful actions taken against Plaintiff by Defendants when he was subjected to a sloppy, flawed, and

biased Title IX sexual misconduct process, which was carried out under the presumption of Plaintiff's guilt as a male accused.

2.     Prior to the events described herein, Plaintiff was a well-loved art professor at Augusta University ("Augusta" or the "University") with an upstanding reputation in the art community. Defendants' actions which lead to erroneously finding Plaintiff responsible for sexual misconduct have tarnished Plaintiff's career opportunities and caused him to suffer severe emotional distress.

3.     On March 2, 2020, Plaintiff was notified by Defendant Reed, Augusta's Title IX Coordinator, that the University was initiating an investigation against Plaintiff for alleged Title IX violations. Plaintiff met with Defendant Reed the next day, when she informed him of the charges against him, but never revealed the identity of the accusers. Rather, Defendant Reed merely stated that the allegations came from five to six different students, stemming from courses between the summer 2019, fall 2019 and spring 2020 semesters. This left Plaintiff in the dark throughout the entire Title IX process without a proper ability to respond to the charges and formulate a defense.

4.     From the start, the University's Title IX investigation was plagued with flaws, bias, and overreach. For example, the credibility of the reporting students was never questioned by University investigators despite clear contradictions to their

2

stories. Instead, the University took their statements at face value and in order to paint a story which would produce a finding of responsibility for Plaintiff.

5.     As the identities of the reporting students were never revealed, the investigation was done without identified complainants and therefore was conducted not only without any opportunity to question the complainants, but also without affording Plaintiff any hearing at all.

6.     Moreover, Plaintiff was provided with improper and vague Title IX guidelines which delineated a hearing process, so Plaintiff reasonably operated under the assumption that he would be afforded a hearing. However, Defendants later informed him that they made a "mistake" and there would be no hearing.

7.      The entire process was disorganized, rushed, flawed, and careless, and resulted in the erroneous finding of responsibility and sanction of a semester-long suspension from the University, prohibition from being on campus during the suspension, and a permanent notation in his file.

8.     Defendants' investigation and adjudication of the unnamed complainants' allegations was tainted by gender bias resulting from federal and local pressure to protect female "victims" of sexual misconduct, and to reform Augusta's policies to take a hard line against male students and faculty accused of sexual misconduct.

As a result, Plaintiff was deprived of an adequate opportunity to defend himself against the charges.

9.     Defendants' conduct herein subjected Plaintiff to reputational harm, distress, and significant economic harm, including without limitation lost earnings, loss of future earnings, and loss of career prospects. Defendants' conduct will continue to have long-term and severe consequences for Plaintiff.

10.     Due to the Defendants' miscarriage of justice, Plaintiff has now been labeled a sex offender and has been ostracized by professional colleagues and students. Plaintiff has suffered and will continue to suffer ongoing reputational harm due to Defendants' conduct.

11.     For the foregoing reasons, Plaintiff now brings this action to obtain monetary and injunctive relief[1].

## **THE PARTIES**

12.     Plaintiff is a natural person and a resident of the state of Georgia.

13.     Defendant Board of Regents consists of nineteen members who are responsible for establishing policies and rules that govern the University System. It is

---

[1] Plaintiff has filed charges of employment discrimination with the Equal Employment Opportunity Commission and intends to amend the Complaint to include relevant federal and state claims once he receives a right to sue.

4

governed by Title 20 of the Georgia Code and maintains its principal place of business in Atlanta, Georgia.

14.     Defendant Reed is a natural person, and at all relevant times herein, was Augusta's Title IX Coordinator. Upon information and belief, Reed is a resident of Georgia.

15.     Defendant Thorp is a natural person, and at all relevant times herein, was Chair of Augusta's Department of Art and Design. Upon information and belief, Thorp is a resident of Georgia.

16.     Defendant Hutton is a natural person, and at all relevant times herein, was Augusta's Title IX Investigator. Upon information and belief, Hutton is a resident of Georgia.

17.     Defendant Keel is a natural person, and at all relevant times herein, was Augusta's President. Upon information and belief, Keel is a resident of Georgia.

## JURISDICTION AND VENUE

18.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the constitution and statutes of the United States.

19.     This Court has personal jurisdiction over Defendant Board of Regents on the grounds that Defendant is conducting business within the state of Georgia.

20.     This Court has personal jurisdiction over Defendant Reed on the ground that she was employed by Augusta as Title IX Coordinator at all relevant times herein.

21.     This Court has personal jurisdiction over Defendant Thorp on the ground that he was employed by Augusta as Chair of the Art Department at all relevant times herein.

22.     This Court has personal jurisdiction over Defendant Hutton on the ground that he was employed by Augusta as Title IX Investigator at all relevant times herein.

23.     This Court has personal jurisdiction over Defendant Keel on the ground that he was employed by Augusta as President of the University at all relevant times herein.

24.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## <u>FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS</u>

## I.     <u>BACKGROUND</u>

### A.     **The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints**

25.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

26.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

27.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. See Joseph Shapiro, Campus Rape Victims: A Struggle for Justice, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-

ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

28.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." See Christopher Krebs and Christine Lindquist, Setting the Record Straight on "1 in 5", Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

29.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof — "more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

30.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.  For example, it states (DCL at 12) that schools should give both parties the

8

right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. Additionally, the DCL stated that schools must take steps to protect the complainant, as necessary, including taking interim steps before the final outcome of the investigation. Such steps include transferring alleged perpetrators, if necessary, away from shared courses or housing. (DCL at 15-16).

31.     The DCL (p. 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

32.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

33.     Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

34.     After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

35.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled Questions and Answers on

Title IX and Sexual Violence ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf  (OCR's April 2014 Q&A at 9, 12.)

36.    The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id*. at p. 31.

37.    In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, the document states that schools:

      a.  "must not require a complainant to be present" at sexual misconduct disciplinary hearings (p. 30);

      b.  may decide to eliminate all opportunities for "cross-examination" (p. 31); and

      c.  must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 25).

38.     Neither OCR's April 2014 Q&A nor the DCL were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the DCL constituted substantive decision-making.

39.     In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled Not Alone, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, Not Alone (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.  The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

40.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See Testimony of Catherine E. Lhamon*, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014),

https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

41.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited August 2, 2021).

42.    The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct. In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . . [i]t's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention. Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendant instead."

43.    Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal

government," including claims that college campuses had become "hazardous places" for female students. *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529. For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

44.    Notably, a study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates and has no negative impact on securing donations. *See* Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

45.    The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university. Instead, [it found] evidence that these

investigations increase freshman applications and enrollment, for both female and male students." Id. The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . [d]ata suggests that federal Title IX investigations have no detectable effects on donations." *Ibid*. In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

46.    Colleges and universities, including Augusta, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like Augusta, have limited procedural protections afforded to respondents, like the Plaintiff, in sexual misconduct cases.

47.    On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many." Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

48.    DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

49.    Acknowledging the massive pressure placed on universities and educational programs, by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

50.    With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.*  She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

51.    On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague                    Letter                    (Sept.                    22,                    2017),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf   ;

*see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017),

https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

52.   In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*."   Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

53.   In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

54.   The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches."  2017 Q&A at 4, 5.

55.   The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex

discrimination, including sexual misconduct." *Id*. at 3 (emphasis added).  In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] . . . [e]nsur[ing] an *adequate, reliable, and impartial* investigation of complaints." *Ibid*. (emphasis added).

56.     The 2017 Q&A also requires investigators to "synthesize *all available evidence*— including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

57.     The 2017 Q&A also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

58.     Likewise the 2017 Q&A, in a significant departure from the DCL, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings.  *Id*. at 4; *see also id*. footnote 19 at 4.

59.     The 2017 Q&A suggests that the policies and procedures in place at Augusta at all times relevant to this lawsuit—which were tailored in such a way as

to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

60.    On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

61.    Despite a different direction announced by the Trump Administration, colleges, universities, and educational programs including Augusta have mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

62.    In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, "*Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct.*" (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct) The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread

institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

63.     In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal."  While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available."  The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

**B.      Local Pressure on Augusta to "Believe All Women" and Resulting Bias Against Males**

64.      Since the creation of the newly named Augusta in 2017[2], the University has had a culture that conformed to the notion of "believe all women" in the midst of the #MeToo era. This culture can be seen in the events hosted on campus and from explicit statements from Augusta's administration.

65.      Beginning in 2017, Augusta created a Domestic Violence Awareness Month Committee which paired with SafeHomes of Augusta Domestic Violence Center to coordinate events in an effort to "raise awareness and unite those working to end abuse." *See Campus honors victims of domestic violence with series of events,* Jagwire (Oct. 12, 2017).

66.      Annual events have included the SafeHomes Survivors' Walk, which "features testimonies from domestic violence survivors, a balloon release and a candlelight walk to honor victims" and panel discussions where survivor stories are shared to raise awareness. *Id.* Other events have included an annual interactive play entitled "Why Do They Stay? Understanding the Victim's Perspective," as well as a Title IX case studies workshop where employees can "gain important knowledge

---

[2] Augusta had previously been named Georgia Regents University.

about victim-centered response." These events focused mainly on portraying women as the victims of sexual assault.

67.    Defendant Reed can often be seen promoting these victim-oriented events on her Twitter account.[3]

68.    Defendant Reed not only shares one-sided events on her Twitter which support the "victim" and offers no events supporting respondents, but she also shares various opinion tweets and retweets which demonstrate her mindset that women are the victims and males are the perpetrators.

69.    Defendant Reed has also retweeted a statement to "[s]top teaching girls & women how not to be sexually harassed and assaulted. Start teaching boys & men not to be predators."

70.    Moreover, Defendant Reed retweeted multiple statements regarding believing all survivors, such as "[s]exual assault survivors who aren't believed face a higher risk of mental health issues. That's why it's so important to believe survivors," as well as "I support survivors."

71.    In addition, Defendant Reed makes her stance clear in her Twitter retweets that "[a]ny and all allegations of domestic and dating violence need to be

---

[3] Defendant Reed's Twitter account can be found at @micheleReed66.

addressed and taken seriously," and "sexual assault and domestic violence are diffi-
cult things to talk about. Talk about them anyway."

72.    In regard to the resignation of Katie Hill,[4] Defendant Reed retweeted a
statement which stated that "[w]hile Hill is resigning amid allegations of an inap-
propriate relationship with a staffer, it also falls after a campaign of harassment and
revenge porn from an abusive ex-husband. We need to talk about both pieces,"
thereby demonstrating Defendant Reed's mindset that, on information and belief,
"victims" can explain away their actions as a result of their alleged abuse.

73.    Defendant Reed additionally tweeted that she "dream[s] of a day when
women will be viewed as likable and competent" and retweeted a Father's Day tweet
which wished a happy Father's Day to men who are focusing on the "dismantling of
patriarchy."

74.    Further, Defendant Reed invites her followers on Twitter to join her in
weekly "#StopSexism" Social Interest Group calls. These calls have topics such as
"How Women Are Treated in Public" and "Why Don't We Believe Women?"

75.    Defendant Reed has also made clear that she is fully aware of lawsuits
against other Universities that have resulted from alleged failure to properly respond

_____

[4] Katie Hill served as a congresswoman from California who resigned after
allegations of ethical violations.

to allegations of sexual assault. In regard to a Dartmouth settlement with victims, Defendant Reed tweeted "[t]he stakes are high for colleges and Universities and the payout for Dartmouth is a lesson learned."

76.     As a result, on information and belief, Augusta faced internal pressure from its own Title IX coordinator's bias against men to fiercely pursue any and all allegations made by women against male perpetrators.

77.     Defendant Hutton, who served as an investigator of the allegations against Plaintiff, has a Twitter account[5] that puts his anti-male bias on full display.

78.     For example, Defendant Hutton showed his support of the statement that "women are not to be collateral damage to the sins of men." Defendant Hutton also uses the phrase "DARVO" often, which stands for "deny, attack and reverse victim and offender," which Defendant Hutton states is the "rule, not the exception" for the actions undertaken by alleged perpetrators of sexual misconduct.

79.     Defendant Hutton's Twitter biography even states that he "hates abuse" and contains an overwhelming number of tweets concerning supporting victims and condemning those accused of sexual misconduct.

---

[5] Defendant Hutton's Twitter account is @HuttBen.

80.     Notably, Hutton agreed that there is "emotional abuse" in the courtroom for victims of sexual assault, thereby demonstrating his tendency to not aggressively question or "retraumatize" accusers.

81.     Significantly, even Augusta's Title IX Twitter account[6] demonstrates Augusta's institutionalized bias against males. Augusta retweeted a "call to men" that stated "let's foster an environment where women feel comfortable coming forward. Listen to women. Believe them."

82.     Also, Augusta incredibly stated in a tweet "Don't Believe Betsy DeVos. Title IX Already Has a Fair Process for Students Accused of Sexual Assault" in response to DeVos' efforts to provide minimal due process protections to respondents accused of sexual misconduct.

83.     On information and belief, Defendants' bias against males is deeply rooted within the University's administration. Unfortunately, this case demonstrates yet another example of the University's bias against males.

---

[6] Augusta's Title IX Twitter account is @AUTitleIX

## II.   CHRONOLOGY OF EVENTS

### A.   Plaintiff

84.     Plaintiff has been part of Augusta since 1996 and has considered the Augusta community to be his second family. Plaintiff's family moved to Augusta, Georgia in his teenage years, where he completed high school, began attending Augusta in 1996, and earned his bachelor's in fine arts from Augusta in 2001. Plaintiff met his wife while attending Augusta and still lives in the area.

85.     While at Augusta, Plaintiff's passion for painting and drawing flourished and he decided to pursue a master's in fine arts at Radford University in Radford, Virginia.

86.     After obtaining his master's degree, Plaintiff returned home to his alma mater and has taught Art courses at Augusta since 2006, including painting of various levels, drawing of various levels, world humanities, marvel of art, and 2D design.

87.     Plaintiff is a well-loved teacher, with an average rating of 4.4/5 on Rate My Professors.[7] Significantly, no student has ever complained of any kind of misconduct concerning Plaintiff in these reviews.

[7] Rate My Professors is a website that allows students to review professors and give them an overall score based on their teaching.

88.     Indeed, Plaintiff's conduct throughout his time at Augusta had been so exemplary that he was promoted in February 2020 to Senior Lecturer.

89.     As well as teaching art courses, Plaintiff also exhibits his art regularly. His work focuses heavily on oil painting landscapes as well as the nude figure. Plaintiff uses his artwork to explore the theme of identity, psychology of the self, and living with social anxiety and depression while raising a child in a world with increasing social and political divides.

90.     Due to the nature of Plaintiff's work, his classes often feature nude models, as is typical for such art courses. On days when there was a model for the class, the model would go into the classroom and change into a robe in a separate room, and then would go into the classroom where the students were ready to draw. While drawing the model, students were directed to put their cell phones away for the remainder of the class.

91.     During one particular class, one of Plaintiff's students, EA, was sitting a good distance away from the model and was struggling to draw the model's foot in the model's seated position. EA asked Plaintiff for help multiple times.

92.     Plaintiff, after attempting to help EA with the drawing several times, asked the model if he could take a picture from EA's view to assist EA's drawing. The model consented to the photo being taken.

93.     Plaintiff took the photo, blurred out the model's genitalia and face, showed the model the photo for her consent, and after the model consented, projected the photo onto the screen so that EA could trace the model's foot.

94.     No other photos of the model were taken by Plaintiff.

95.     Moreover, the only other time Plaintiff had taken a photograph of a model at any point was at that model's express request.

**B.     Augusta's Flawed Investigation into the Anonymous Allegations Against Plaintiff**

96.     On February 21, 2020, a confidential tip was sent to the Augusta Police that Plaintiff had been using his cell phone to photograph nude art models during class.

97.     On February 25, 2020, this information was forwarded to Defendant Reed and Defendant Thorp, Chair of Augusta's Department of Art and Design.

98.     On February 28, 2020, Defendant Thorp contacted Defendant Reed to report that a student had come to him with complaints against Plaintiff. Interestingly, two other professors also reported to Defendant Reed that other students had come to them with complaints about Plaintiff's conduct in class as well. On information

and belief, these students conspired to bring forward false complaints about Plaintiff at the same time in order to have him terminated from his position at the University.

99.    On March 2, 2020, Plaintiff was notified by Defendant Reed of the complaints via a vague email in which Defendant Reed merely asked to meet with Plaintiff "regarding allegations" and stated that she "oversee[s] the Student Sexual Misconduct policy" and would "provide [Plaintiff] with due process." Despite the ambiguity, Plaintiff was eager to cooperate in the hope of having his name cleared.

100.   Plaintiff met with Defendant Reed on March 3, 2020, and Defendant Reed informed Plaintiff that the allegations concerned touching students in class and taking photos of a nude model, against class policy.

101.   Plaintiff was unaware of the complainants' identities but attempted to respond to the allegations the best he could in the meeting without knowing the specific alleged incidents that led to the complaints.

102.   Defendant Reed then informed Plaintiff that he would receive her intake notes and summary of the interview and would be assigned investigators promptly.

103.   A few days later, Plaintiff was informed by students in the art department that there were rumors circulating about Plaintiff from a small group of students who were "trying to get" Plaintiff.

104.   Indeed, one of the students that was part of the group had been heard on prior occasion loudly stating that she "hates" Plaintiff. Notably, the person to whom this student proclaimed her hatred for Plaintiff was on Plaintiff's witness list but was never contacted by the investigators for an interview.

105.   Multiple different students came to Plaintiff over the next few days, all pointing to the same group of students who sought Plaintiff's ouster.

106.   On information and belief, not only did these students conspire within their group to embark on a smear campaign against Plaintiff, but they also conducted a fishing expedition to find any other information they could use to ruin Plaintiff's reputation.

107.   Plaintiff was informed by several alumni of Augusta, including DI and MP, that a student, EG, had reached out to them in February, 2020, stating that students were trying to bring charges against Plaintiff and asking if the alumni had any stories which could be used to do so. One alumnus sent Plaintiff a screenshot of these messages, which was submitted to the investigators but was never included as evidence nor was the alumnus ever contacted.

108.   That same week, one non-art major student, KH, reached out to Plaintiff after hearing the rumors that were being spread across campus about Plaintiff. She stated that she would write a letter in support of Plaintiff because it appeared to be

an orchestrated smear campaign by a small group of students. KH also informed Plaintiff that the same student who had previously been mentioned as the orchestrator of these rumors, AM, had previously approached her after witnessing a quick hug between her and Plaintiff at an art opening downtown and asked her if the hug made her uncomfortable, to which KH replied "no."

109.   KH was also on Plaintiff's witness list, but her interview was rescheduled by the Investigator multiple times until she was ultimately listed as an irrelevant character witness.

110.   On March 11, 2020, Plaintiff reached out to Defendant Reed after not receiving the intake notes and summary she stated she would send. Later that day, Defendant Reed emailed Plaintiff her intake notes. The email also designated Renee Wray and Debra Arnold as the unofficial investigators of the matter.

111.   That same day, Plaintiff was approached by Defendant Thorp to inform Plaintiff that he was being placed on administrative leave with pay pending the outcome of the investigation.

112.   Plaintiff also received an email from Dean of the College of Arts, Elna Green, ("Dean Green") confirming the administrative leave.

113.   Defendant Thorp told Plaintiff that he was to immediately leave campus and not return, despite the fact that the University had been informed of the

allegations weeks prior and had taken no interim action, signaling that Plaintiff was not perceived as an immediate threat to anyone on campus.

114.   Until he was placed on leave, Plaintiff continued to teach his classes.

115.   Throughout this time, AM had been actively seeking Plaintiff's help and guidance. He even went to Plaintiff the morning of March 11, 2020, for academic advice. AM had always been complimentary of Plaintiff's teaching style and had even submitted a glowing letter of recommendation for Plaintiff's application for promotion in February of 2020.

116.   On March 20, 2020, Plaintiff emailed Defendant Reed as he had not heard anything about the investigation and was anxious to have the process proceed promptly. Plaintiff also stated that he had not received an email designating the official investigators for the matter. Defendant Reed never replied to Plaintiff's email.

117.   On March 21, 2020, one of Plaintiff's former models, ML, contacted him, stating she was extremely disturbed after being contacted by AM, who asked her if Plaintiff was ever inappropriate with ML when she was modeling for his class, indicating that he had a pattern of being inappropriate with his models. ML vehemently disputed AM's assertions about Plaintiff.

118.   Notably, ML was on Plaintiff's witness list but was never contacted by the investigators for an interview. ML also provided a written statement to the investigators, which was only included in the appendix of the investigation report.

119.   On March 25, 2020, after receiving no reply to his March 20, 2020, email and receiving no communications regarding the investigation in over two weeks, Plaintiff sent a certified letter to Defendant Reed inquiring about the status of the investigation.

120.   On March 26, 2020, Plaintiff received an email addressed to "Professor Thorp" from Defendant Reed, designating Renee Wray and Debra Arnold as the official investigators.

121.   In this email, Defendant Reed included part of the misconduct policy which states "[w]here a case is not resolved through informal resolution, or informal resolution is not available, due to the nature of the charges, *the matter will be heard through a hearing officer or a hearing panel*." (emphasis added).

122.   The email also suggested that respondent submit a written statement and gather relevant documents and evidence.

123.   Plaintiff prepared his statement and evidence and submitted the documents to the investigators on March 30. Due to the COVID-19 pandemic which had recently become recognized as extremely serious and the uncertainty of how that

would affect the ability to conduct interviews, Plaintiff requested of his witnesses that they submit written statements with their contact information listed in order to expedite the process.

124.   On March 31, 2020, Plaintiff received an email from Defendant Reed in which she stated that the two previously assigned investigators were not available due to an undisclosed conflict of interest and that she would be sending another letter designating new official investigators.

125.   On April 6, 2020, Plaintiff received another email which designated Defendant Hutton and Justin Jerome ("Jerome") as the new official investigators. The April 6, 2020, letter once again included policy excerpts which indicated that if the matter was not resolved through an informal resolution, the matter would be handled via a hearing.

126.   On April 10, 2020, Defendant Reed emailed Plaintiff concerning his witness list, asking Plaintiff to indicate the relevance of each witness. Plaintiff promptly replied by email, indicating the relevance of his witnesses.

127.   Critically, the University still refused to disclose the identities of the individuals who made the complaints against Plaintiff. On information and belief, this was done to protect the identities of the witnesses who conspired against Plaintiff, and, as stated by Defendant Reed, to protect the witnesses from "retaliation."

128.   In a continuation of the planned, coordinated smear campaign against Plaintiff, a group of students spoke to the investigators regarding their false allegations.

129.   On April 22, 2020, the investigators met with the first anonymous complainant, who was designated as Student A.

130.   Student A alleged that she saw Plaintiff take a picture of a nude model on his cell phone without the model's consent and without announcing that he was taking the photo. She also stated that the model seemed anxious while posing in the classroom. Interestingly, Student A also brought forth a host of other "concerns" in an effort to damage Plaintiff, which the investigators stated were not within the scope of the Title IX investigation.

131.   The investigators also met with Student B on April 22, 2020. Student B alleged that they witnessed Plaintiff (i) grab another student by the waist while attending an off-campus event in January; and (ii) spend more time on the female students in his class than male students. Student B also stated that two other female students said that they refused to attend a class that Plaintiff was substitute teaching for because they felt uncomfortable. However, Student B failed to identify the two other female students referred to.

132.   Significantly, Student B also stated that they were in Plaintiff's studio for two sessions which featured a nude model and that they were unaware of any photos being taken by Plaintiff.

133.   On April 22, 2020, Student C met with the investigators. Student C falsely alleged that Plaintiff had been sending direct messages via Instagram to female students including Student M, Student L, and Student J to ask if they would model for him. Significantly, Students M, L, and J all declined to participate in the investigation, and thus, Student C's claims were unsubstantiated.

134.   Student C also alleged that Plaintiff whispered in her ear during class and often said private things aloud which made her uncomfortable, but that she did not say anything due to Plaintiff's position as a professor. Notably, Student C was unable to give specifics as to the "private things" that she was claimed to have heard.

135.   Despite the glaring credibility concerns and inconsistencies in the students' statements, Plaintiff was presumed guilty as a male accused before he could even present his side of the story.

136.   On April 22, 2020, Defendant Thorp contacted Plaintiff via email regarding his annual evaluation. The evaluation not only mentioned the ongoing Title IX investigation, but also gave Plaintiff the lowest possible ratings in every category.

137.   Defendant Thorp attempted to claim that the ratings were due to a pattern of "improper behavior" by Plaintiff. Until that evaluation, Plaintiff had continuous, positive annual evaluations, as well as peer and student reviews, since his initial employment in 2006.

138.   On information and belief, the evaluation was impacted by the Title IX investigation before the claims were adjudicated.

139.   In response to the negative evaluation, Plaintiff, in an online Microsoft Teams meeting with Defendant Thorp, requested that he be permitted to write a rebuttal to the evaluation. Defendant Thorp agreed, and Plaintiff submitted his rebuttal on May 4, 2020, citing his years of positive evaluations.

140.   Defendant Thorp disregarded the rebuttal and stated that Plaintiff would not be needed to teach the summer classes he was scheduled to teach. Defendant Thorp then stated that he needed to have an "urgent" meeting with Plaintiff.

141.   In the meantime, on May 1, 2020, the investigators met with Student E. Student E alleged that he had to beg Plaintiff for help on assignments because Plaintiff helped his female students more and further stated that Plaintiff made inappropriate jokes during class.

142.   Student E also claimed that Plaintiff violated his student accommodations for extra time on tests. Significantly, Plaintiff's classes did not use sit-down written tests, thus directly impacting the credibility of Student E's claim.

143.   On May 6, 2020, Student D met with the investigators and alleged that Plaintiff asked female students to model for him and that he took photos of a model on his cell phone during class. Student D also alleged that Plaintiff would get close to female students and touch them while reviewing their work.

144.   On May 7, 2020, Student F met with the investigators. Student F alleged that Plaintiff made racial jokes during class. Student F also stated that Plaintiff seemed to have a "type" as all of his models were young, curvy females and that he would often touch female students and models.

145.   These students' statements were directly contradicted by the statements of Plaintiff's former in-class models submitted to the investigators in which the models stated that Plaintiff never made them feel uncomfortable.

146.   On May 8, 2020, Plaintiff had his meeting with Defendant Thorp and Dean Greene. In that meeting, Defendant Thorp stated that he was initiating the process to terminate Plaintiff with cause, and that Plaintiff could resign or else he would be terminated.

147.   In an attempt to support his initiation of the termination process, Defendant Thorp cited a written "aide to memory" from *ten years prior* as well as the Departmental Life Model "Policy," neither of which were proper grounds for removal under the Board of Regents Policy.[8]

148.   In fact, this model "policy" was not numbered, sponsored, discussed, voted on, and did not contain any approval signatures, in violation of Augusta's Policy on Policies.

149.   On May 13, 2020, *more than two months* after being made aware of the allegations against him and after multiple witnesses for the complainants had already been interviewed, Plaintiff had his initial investigatory meeting with Investigators Jerome and Defendant Hutton.

150.   In the meeting, the Investigators continued to refuse to disclose the identities of the complainants and thus Plaintiff had no way to properly defend himself or tell his side of the story. Plaintiff merely had to respond to the Investigators' general questions as best as he could, without knowing the specific instances from which the allegations arose.

---

[8] Plaintiff was only able to locate the model "policy" after extensive searching, as it is not used within the department. Indeed, numerous faculty members within the art department were unaware that such a policy existed, and it contained numerous provisions which were contrary to typical procedure within the department.

151.   On May 21, 2020, Plaintiff submitted an official grievance letter to the Grievance Committee detailing what he presumed was his termination after his termination meeting with Defendant Thorp. However, the sub-committee's initial report stated that Plaintiff could not grieve the termination because the termination had not yet come to pass. The sub-committee stated that, in any event, only the President of the University could issue terminations. Thus, Defendant Thorp was merely attempting to intimidate Plaintiff into resigning while skipping over mandated steps in the termination process as stated in University policy.

152.   On May 27, 2020, after submitting the grievance, Plaintiff noticed that close to $1,000 was missing from his paycheck. Plaintiff contacted Defendant Thorp, who conveniently stated that it was a "mistake" just a few weeks after he attempted to terminate Plaintiff.

153.   On June 4, 2020, Plaintiff received an email from Assistant Provost, Kathy Browder, informing him that the faculty committee had completed their review of Plaintiff's termination process initiated by Defendant Thorp. The faculty committee did not recommend termination, but rather recommended "further inquiry" into the matter.

154.   On June 5, 2020, Student K spoke with Jerome via a phone call. Student K alleged that Plaintiff often acted in ways that made the students uncomfortable

during class and that Plaintiff asked Student K if the student's mother would model for the class.

155. Student K alleged that three other students were also said to have witnessed the falsely alleged "unprofessional" conduct by Plaintiff in class, but all three declined to participate in the investigation.

156. To refute the allegations, Plaintiff provided numerous statements from witnesses to corroborate his professional conduct at all times both in and outside of the classroom.

157. Among the witnesses provided by Plaintiff, EA submitted a written statement to the investigators on March 23, 2020, wherein she described the clear consent that Plaintiff obtained from the model before taking the model's picture in order to help EA draw the model's foot.

158. ML, a former model for Plaintiff's classes, also provided a written statement to the investigators on March 24, 2020, wherein she described AM's questioning of her regarding Plaintiff's behavior with class models.

159. ML stated that she was shocked by these questions because she had been a nude model for Plaintiff's classes countless times and never felt uncomfortable at any time. She stated that Plaintiff went above and beyond to protect her privacy

as a model and would reprimand his students if they ever said anything inappropriate.

160.   Model 1, the very model that Plaintiff was alleged to have taken a non-consensual photograph of, provided a written statement and spoke with the Investigators on April 29, 2020. Model 1 stated that the photograph that was taken of her was *completely consensual*, refuting the anonymous complainants' false accusations.

161.   Model 2, also a former model for Plaintiff's class, also provided a written statement stating that Plaintiff never made her feel uncomfortable. She stated Plaintiff took a *consensual* photograph of her during class on her device at *her* request. The Investigators interviewed Model 2 on June 9, 2020.

162.   Plaintiff provided the Investigators with twenty-two more written statements that refuted the complainants' allegations by stating that Plaintiff did not act inappropriately with his students at any time. However, the Investigators declined to interview all twenty-two of these witnesses and deemed them irrelevant character witnesses.

163.   On the other hand, the only witnesses on the complainants' side that were not interviewed were those that declined to participate in the investigation process.

## C.    The Investigators' Report

164.   On June 19, 2020, over three months after Plaintiff was made aware of the allegations against him, Investigator Defendant Hutton emailed Plaintiff the Initial Title IX Report. The report listed Professors Pacheco, Onofrio, and Defendant Thorp, University faculty mandatory reporters, as the complainants instead of the students who brought the complaints forward in the first place. The complaining students were listed as anonymous witnesses, as the University continued to refuse to disclose the complainants' identities.

165.   Defendant Hutton's email stated that Plaintiff would have *at least* three business days to respond to the report. Notably, the University gave Plaintiff the shortest amount of time possible to review and respond to the report, despite the complexity of the report. Plaintiff was given three business days to read and respond to the 49-page initial report. Plaintiff noted the email and requested an extension, yet Defendant Reed and Defendant Hutton refused to accommodate his concern.

166.   The initial report charged Plaintiff with both sexual harassment and exploitation and recommended a one-semester suspension from the University.

167.   On June 22, 2020, Plaintiff responded to the Initial Report by again requesting the identities of the complainants in the matter so that he could adequately respond to the allegations.

168.   Defendant Reed responded to Plaintiff's email, stating that the complainants requested anonymity and thus she would not reveal their identities. However, she stated that Plaintiff could request the names of the complainants through Augusta's Legal Affairs Office.

169.   Plaintiff then requested that Defendant Reed extend his time to respond to the Initial Report in order to allow him time to contact Legal Affairs. However, Defendant Reed declined Plaintiff's request for an extension and continued ahead with the investigation.

170.   Plaintiff submitted a records request for the complainants' names to Legal Affairs on June 23, 2020. Legal Affairs claimed via email that they were "collecting information" regarding the request.

171.   Also on June 23, 2020, Plaintiff emailed Defendant Reed and stated that he noticed Jerome was listed as an Investigator on the Initial Report but had not been copied in on any of the subsequent emails, and asked if he needed to be included.

172.   Defendant Reed responded, stating that Jerome resigned from Augusta and therefore was no longer assigned to the investigation. Plaintiff was never informed as to when Jerome stopped working on the investigation.

173.   Plaintiff then timely submitted his response to the Initial Report, responding to the allegations the best he could without knowing the identities of the complainants, pointing out the numerous inconsistencies and contradictions in the anonymous complainants' allegations.

174.   Plaintiff explicitly named DI and MP, who had received Instagram messages from EG seeking allegations that could be used against Plaintiff.

175.   Plaintiff also named ML, a former model of Plaintiff's, and KH, who had been approached by AM seeking allegations that could be used against Plaintiff following a consensual hug was witnessed between the two.

176.   On June 30, 2020, more than four months after the University received the initial complaint regarding Plaintiff, Defendant Hutton issued the First Final Report, which included a summary of the allegations and the interviews with witnesses.

177.   Critically, none of the witnesses that Plaintiff had named in his response to the Initial Report were interviewed. Rather, all but ML were named as irrelevant character witnesses. ML, on the other hand, while not "irrelevant," was not interviewed by the Investigator.

178.   Without explanation, the exploitation charge against Plaintiff was omitted from the First Final Report. The only charge against Plaintiff in the First Final

Report was sexual harassment. However, although one of the two initial charges was dropped, the recommended sanction remained the same.

179.   Moreover, in the First Final Report revealed that the Investigator did not interview relevant witnesses who could have provided exculpatory statements for Plaintiff, but instead only sought out witnesses who would support the anonymous complainants' stories.

180.   Incredibly, EA, the student whom Plaintiff was helping when the alleged nonconsensual photograph was taken, was not contacted until June 30, 2020, after the Investigator's First Final Report had already been completed, despite the fact that Plaintiff provided her name in his list of witnesses prior to the issuance of the Initial Report.

181.   EA returned the Investigator's phone call requesting an interview, but then never heard back from the Investigator. As a result, relevant and exculpatory evidence which the Investigator knew was available was never obtained and incorporated into the Final Report.

182.   While EA's written statement was included in the appendix of the report, she was not properly interviewed by the investigators and thus her statements were clearly not given appropriate weight. In rendering determinations, the

Investigator did not even address EA's firsthand account that directly contradicted the allegations against Plaintiff.

183.   Notably, one of the witnesses even alleged that EA was one of two students whom Plaintiff allegedly put his arm around in an inappropriate manner. However, EA's statement never made mention of any inappropriate contact.

184.   On information and belief, the Investigators avoided interviewing EA because her statements would refute allegations against Plaintiff and impair their ability to find Plaintiff responsible.

185.   Likewise, the report alleged that Plaintiff spent more time with female students than with male students,[9] so Plaintiff submitted a list of former male students and alumni who would dispute this allegation and who could contest any allegation that Plaintiff improperly favored female students. However, the Investigators never interviewed a single one of the witnesses submitted, and instead deemed them irrelevant "character witnesses."

---

[9] Plaintiff's class enrollments are typically heavily female, with 11-12 female students and only 1-2 male students, so Plaintiff inevitably spent more time with female students.

186.   On July 2, 2020, Plaintiff received the Second Final Report from Defendant Hutton. This report listed *no complainants* and still did not interview any of Plaintiff's witnesses.

187.   On July 6, 2020, Plaintiff received an email from Defendant Reed requesting a meeting to go over the Second Final Report. Plaintiff stated that there were numerous issues with the report, including the fact that there were no complainants listed, and that these issues should be remedied before they had a meeting. Plaintiff also asked Defendant Reed for information concerning the hearing officer and hearing panel that were mentioned in the reports and that Defendant Reed had also referred to multiple times previously.

188.   Defendant Reed responded on July 9, 2020, stating that her previous letters attached to the reports were incorrect, as only student respondents are provided a hearing. She stated that Plaintiff, as an employee, would not be given a hearing. Incredibly, Defendant Reed, who was in charge of overseeing the proper enforcement of Augusta's Title IX policies and procedures, was wholly unable to navigate the convoluted Augusta policies.[10]

---

[10] Augusta's 2019 Final Cleary Act Report is the *closest* to a clear explanation of the conduct process for employees. Page 12 of the report states, "For allegations and incidents involving students as victims and employees as respondents; adjudication involving an employee respondent, shall be addressed utilizing the institution's

189.    Instead, Defendant Reed stated that the next step in the process would be for the Dean[11] of Pamplin College and Human Relations to issue a finding based upon the Second Final Report.

190.    In essence, Defendant Reed affirmed that Plaintiff's finding was to be issued based on a report which failed to include interviews from any of his witnesses or list the complainants in the matter and was therefore inherently one-sided.

191.    That same day, Plaintiff received a letter from Kim Davies ("Davies"), Interim Dean of the College of Arts, Humanities and Social Sciences, stating that he was suspended for the Fall 2020 semester due to a violation of the Sexual Harassment Policy. The letter did not give an explanation, but rather just said that based on the report, she agreed with the recommended one-semester suspension.

192.    On information and belief, from the time of Plaintiff's suspension, the majority of Plaintiff's scheduled classes were reassigned to female instructors or instructors that were involved in the Title IX process.

---

employment policies and procedures" and provides a link to the Augusta Employee Handbook. The Employee Handbook then merely states that the sexual misconduct investigation process could be found in the Sexual Misconduct Policy, linking back to its location in the Student Handbook, which provides for an investigation and hearing before a determination of responsibility is made.

[11] On information and belief, this was referring to Interim Dean Kim Davies.

193.   On July 11, 2020, *after* the investigation ended, Plaintiff received a response from Legal Affairs concerning Plaintiff's information request, stating that because the investigation was closed, they could not provide the identities of the complainants.

194.   On information and belief, Legal Affairs waited to respond to Plaintiff until the close of the investigation so that they would not be obligated to provide Plaintiff with the names of the complainants.

195.   Plaintiff subsequently timely appealed the finding of responsibility on July 13, 2020, to Gretchen Caughman ("Caughman"), Augusta's Executive Vice President and Provost.

196.   Caughman denied Plaintiff's appeal, stating that the numerous procedural inaccuracies would be looked into, but incredibly finding that they had no material impact on the investigation or outcome.

197.   Plaintiff then appealed the decision to Defendant Keel, President of Augusta, on July 28, 2020.

198.   On August 3, 2020, Defendant Keel denied Plaintiff's appeal, stating that there were no unusual circumstances which made the disciplinary action unreasonable.

199.   On August 19, 2020, Plaintiff submitted the final appeal of the decision to Legal Affairs. However, Plaintiff did not receive a response to his appeal.

200.   In the meantime, on information and belief, the anonymous complainants had been very vocal on campus regarding their "issues" with Plaintiff.

201.   In contrast, Davies told Plaintiff on September 16, 2020, that he was not to speak about the complaint or the surrounding issues with anyone, and even that oversharing with his family members would be "problematic."

202.   Although Legal Affairs still had not contacted Plaintiff regarding his appeal, Davies emailed Plaintiff on October 14, 2020, to notify him that his role as Senior Lecturer would not be renewed for the 2021-2022 school year. As such, Plaintiff was effectively terminated after the Spring 2021 semester while his appeal was still pending.

203.   Additionally, that same day, Plaintiff received a Notice of Reassignment of Duties for the Spring 2021 semester from Davies. Plaintiff was to teach none of the classes he was scheduled to teach, but instead was assigned to complete remedial "busy work" including: (1) building a database of Art & Design Alumni; (2) researching and writing a report on opportunities for creative activities/scholarship for students and faculty in Art & Design; (3) writing a report on graduate school opportunities for students that can be included in student handbook; and (4)

researching and writing a report on industrial design programs for which administrators may gain insights for building their own industrial design program at Augusta.

204.   The tasks Plaintiff was assigned to were completely outside of his wheelhouse and wholly unrelated to what he was hired to do. The tasks were essentially a demotion and less prestigious than what he was previously hired, and qualified, to do at Augusta.

205.   Further, the reassignment letter referenced a "memorandum" by Kathy Browder ("Browder") which was not provided to Plaintiff. Plaintiff subsequently asked for the memorandum, which Browder emailed to Plaintiff on October 20, 2020.

206.   The memorandum dated back to September 24, 2020, yet Plaintiff was not aware such a document existed until it was used against him as justification for his reassignment.

207.   The memorandum related to an investigation into terminating Plaintiff with cause and cited five instances, which Browder claimed represented a pattern of behavior: (1) an incident *dating back to 2010*, which had been dealt with by Plaintiff signing an agreement with the school that was never violated, and had not even been brought up in annual evaluations in the ten years prior; (2) a 2019 Title IX

investigation which was *dismissed* due to the fact that there was no evidence for the baseless claims; (3) the 2020 Title IX investigation; (4) violation of the Departmental Life Model Policy, which, as stated above, was not a policy that was ever adhered to nor were any faculty aware of; and (5) contact with a student witness in the 2020 Title IX investigation, which Plaintiff was completely unaware of as the student witnesses were *anonymous*.

208.   None of the instances cited in the memorandum were grounds for dismissal. Indeed, in her memorandum, Browder recommended that Defendant Keel decline to pursue termination with cause but stated that Plaintiff's "pattern" of behavior warranted sending the matter, and the memorandum, back to the Dean for additional measures to be taken. The three measures which the Dean could pursue were continued suspension, additional remedial measures, or non-reappointment. The Dean chose the most severe sanction available despite insufficient evidence.

209.   On November 2, 2020, Plaintiff submitted the appeal of his nonrenewal to Zach Kelehear ("Kelehear"), who was Interim Provost at the time.

210.   On November 13, 2020, Kelehear denied Plaintiff's appeal, providing no explanation beyond that he did not find any procedural errors, even though numerous procedural errors were stated in the appeal.

211.   Plaintiff then sent his appeal to Defendant Keel on November 16, 2020. Defendant Keel denied Plaintiff's appeal on November 23, 2020, *with nearly an identical email to that of Kelehear*. It appeared that the appeal denial was a cookie-cutter email merely being signed by each subsequent reviewer, giving no indication that the appeal had been given fair consideration.

212.   Plaintiff finally submitted the appeal of his nonrenewal to Legal Affairs on December 8, 2020. At this point, Plaintiff had still not gotten a response from Legal Affairs regarding his Title IX sanction despite multiple follow up emails.

213.   Plaintiff then emailed Legal Affairs on December 24, 2020, asking for an update regarding both of the appeals he had submitted. Legal Affairs never responded.

214.   Plaintiff emailed Legal Affairs on January 5, 2021, asking for an update once again and stating that if he did not hear back, he would have his legal representative be in contact with Legal Affairs.

215.   Interestingly, that email prompted Legal Affairs' *first* acknowledgement of Plaintiff's emails since August 2020. On January 6, 2021, Legal Affairs responded, stating that they received the December 8, 2020 submission but did not

receive any communications from Plaintiff in August 2020, despite Plaintiff's *multiple* follow up emails.[12]

216.   Additionally, Legal Affairs stated that the appeal Plaintiff submitted, which was eighteen pages single-spaced, had to be shortened to five pages. Significantly, nowhere in University policies did it mandate that appeals had a page limit.

217.   Plaintiff responded on January 8, 2021, stating these issues, and Legal Affairs subsequently agreed to accept both of Plaintiff's appeals in their original length, although required the appeals and exhibits to be reformatted into a single PDF. Plaintiff complied, and resubmitted both of his appeals on January 24, 2021. Legal Affairs responded on February 17, 2021, stating that the appeal would be considered at the upcoming regularly scheduled April meeting.

218.   On April 13, 2021, over one year after the initial complaint, Plaintiff received a final denial from Legal Affairs.

219.   Plaintiff has exhausted all available avenues for appeal under Augusta's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

---

[12] Plaintiff is in possession of proof of delivery emails which show that his emails were indeed delivered to Legal Affairs.

## III.   AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRAN-TIES BETWEEN PLAINTIFF AND DEFENDANT BOR

220.   Upon Plaintiff's employment, Plaintiff and BOR became mutually bound by, including but not limited to, the Augusta Employee Handbook (the "Handbook"), Sexual Misconduct Policy (the "Policy"), and the Board of Regents Policy (the "Board Policy") (hereinafter collectively referred to as the "Policies").

221.   On information and belief, the Policies are updated and/or reviewed each new school year.

222.   On information and belief, in response to federal pressure placed on universities: i) for failing to protect female accusers, and ii) to take a strong stance against males accused of sexual assault, Defendants applied the Policies in a manner that resulted in harsher penalties for males accused of sexual misconduct as compared to females.[13]

223.   The Policies represent a contract between students/employees and the University, and, in particular, between Plaintiff and BOR.

224.   Through the actions of the University's Title IX office in investigating and adjudicating the complainants' allegations in this case, Defendant BOR

---

[13] Augusta has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policies and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome.

225.   The Board Policy states that a "[d]iscussion between the faculty member and appropriate administrative officers looking toward a mutual settlement" must be had before dismissal of a faculty member.

226.   Defendants breached the Board Policy when Defendant Thorp proceeded to inform Plaintiff that he was initiating Plaintiff's termination with cause without an appropriate discussion seeking settlement.

227.   The Handbook states that, regarding Title IX procedures, "You will find additional information and specific details in the Policy, which is available online at [http://www.augusta.edu/student-life/conduct/sexual-misconduct-policy.php](http://www.augusta.edu/student-life/conduct/sexual-misconduct-policy.php)."

228.   Defendants breached the Handbook by not following the Sexual Misconduct Policy provisions as set forth in the linked Student Sexual Misconduct Policy that the Handbook directs employees to and that provides for a hearing for the adjudication of sexual misconduct matters.

229.   According to the Policy, a complainant is "[a]n individual lodging a complaint…A complainant of sexual misconduct may… file a misconduct report with a Responsible Employee or Coordinator."

230.   Defendants breached the Policy by failing to list the students that filed complaints with faculty as complainants, and instead kept their identities anonymous and reported the Responsible Employees as the complainants.

## IV.   **PLAINTIFF'S DAMAGES**

231.   As a direct and proximate result of Defendants' biased, illegal, and improper conduct, an erroneous finding that Plaintiff engaged in sexual misconduct has been made a part of Plaintiff's employment file and Plaintiff's longstanding employment at Augusta has ended. These records may be released to other educational institutions where Plaintiff applies to teach. The anonymous complainants' complaints painted Plaintiff as a sexual harasser, wiping out a lifetime of hard work and outstanding employment at Augusta.

232.   By improperly finding Plaintiff responsible and terminating his employment, Defendants have damaged Plaintiff's earning capacity and future employment prospects. Specifically, as a result of Defendants' actions, Plaintiff will be forced to disclose and explain to potential employers to which he may apply that he was found responsible at Augusta for sexual misconduct.

233.   In the wake of the #MeToo movement, schools and other employers will not be clamoring to hire someone who has been found responsible for sexual misconduct.

234.   Due to Defendants' biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, and improper investigation and adjudication process which destroyed his reputation and will permanently impact his future career earnings.

235.   Due to Defendants' biased, illegal, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

236.   Due to Defendants' biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his present and future career earnings.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972: Erroneous Out-come**
**(Against Defendant BOR)**

237.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

238.   Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

239.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant BOR.

240.   On information and belief, Augusta receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

241.   Title IX is enforceable through a private right of action.

242.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

243.   Under the 2001 Title IX Guidance, which was relied upon by Augusta officials at the time of their decision finding Plaintiff responsible, the "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial

investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process." Dep't of Ed., *Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

244.   According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must accord "due process to both parties involved." *Id.* at 22.

245.   According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

246.   Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

247.   Defendants engaged in gender bias in the investigation and adjudication of the anonymous complainants' complaints. Plaintiff was innocent and wrongly found to have committed a violation of Augusta's policies, and gender bias was a motivating factor.

248.   Defendants failed to conduct an adequate, reliable, and impartial investigation because, by way of example and not limitation:

    a.  Defendants failed to give Plaintiff adequate notice of the allegations against him, depriving him of the ability to prepare for his interviews;

    b.  Defendants failed to inform Plaintiff of the identities of the complainants so that Plaintiff could fully understand the specific instances giving rise to the allegations against him;

    c.  The Investigators failed to interview a multitude of Plaintiff's witnesses that could have provided information that would directly refute the charges;

    d.  Legal Affairs deliberately waited until the end of the investigation to respond to Plaintiff's request for the complainants' identities;

    e.  Defendants failed to provide Plaintiff with a hearing before the finding of responsibility was made; and

    f.  Defendants displayed a presumption of guilt by allowing the Title IX investigation to negatively impact Plaintiff's performance evaluations before a finding of responsibility had been made.

249.  Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

    a.  The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the University was not compliant;

    b.   Longstanding anti-male bias within the University's Title IX office, as demonstrated by the Twitter accounts of Defendant Reed, Defendant Hutton, and the Augusta Title IX office;

    c.   Defendants' refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to give adequate weight to Plaintiff's statements and those of his witnesses;

    d.   Defendants' failure to afford Plaintiff the presumption of innocence; this presumption would have required Defendant to weigh the testimony of both sides equally, and not merely take the anonymous complainants' unsupported claims at face value; and

    e.   Defendants' failure to properly apply the preponderance of the evidence standard.

250.   On information and belief, BOR has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students and employees, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

251.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

252.   This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to, loss of future career opportunities, reputational damage, economic injuries, emotional trauma, and other direct and consequential damages.

253.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Augusta to: (i) reverse the outcome and findings regarding the anonymous complainants' complaints; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A SECOND CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972: Sex Discrimination – Retaliation
(Against Defendant BOR)**

254.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

255.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

256.   Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant BOR.

257.   Title IX prohibits sex discrimination against employees of universities that receive federal funding—its protections are not limited to students. Employees, as well as students, have a private right of action under Title IX. *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017).

258.   Retaliation against a person who complains of sex discrimination constitutes intentional sex discrimination that is actionable under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005); *Mercy Catholic*, 850 F. 3d at 564.

259.   While the investigation was ongoing, and before Plaintiff had been found responsible, Defendant Thorp, for the first time, issued a negative performance evaluation report citing a "pattern" of inappropriate behavior, despite Plaintiff's consistently stellar performance reviews in years prior.

260.   Additionally, Defendant Thorp attempted to terminate Plaintiff for cause due to the alleged behavior pattern, despite the fact that Plaintiff had never been contacted by the University about his alleged behavior.

261.   On information and belief, the University had decided, before any findings had been made and regardless of the Title IX outcome, that Plaintiff was responsible and must be terminated.

262.   Moreover, after Plaintiff was erroneously found responsible for sexual harassment, and placed on suspension, Augusta implemented further punishment on

Plaintiff that went beyond his original sanction by reassigning his duties for the up-
coming semester and notifying Plaintiff that he would not be renewed at the end of
his contractual term.

263.   Davies' reassignment letter cited a memorandum that claimed, again,
that Plaintiff had a pattern of inappropriate behavior. However, none of the issues
stated in the memorandum were actionable. Indeed, the memorandum cited:

   a.  An incident from ten years prior that had been resolved and had not
       been an issue in the ten years since the resolution;

   b.  A Title IX investigation from 2019 that was dismissed;

   c.  The 2020 Title IX investigation;

   d.  Alleged violation of the Department Model Policy, which, on infor-
       mation and belief, up until that point had not been followed by any
       instructors nor been used as the basis for discipline; and

   e.  Inadvertent and unknowing contact with one of the anonymous
       complainants from the 2020 investigation.

264.   Defendant BOR retaliated against Plaintiff for his involvement in the
2020 Title IX investigation beyond the sanction that he was given when he was er-
roneously found responsible.

265.   On information and belief, Plaintiff was singled out as the scapegoat
for the University's perceived failure to address the sexual harassment of female

students at the hands of male faculty members in the wake of the rise of the #MeToo movement.

266.   On information and belief, Plaintiff was retaliated against due to the campus culture of anti-male bias as demonstrated by the Twitter accounts of Defendant Reed, Defendant Hutton, and Augusta's Title IX office.

267.   The above stated acts of retaliation against Plaintiff for defending himself against an unauthorized and unwarranted investigation constituted unlawful discrimination in violation of Title IX and caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, reputational damage, emotional distress, loss of career, economic injuries, and other direct and consequential damages.

268.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Augusta to: (i) reverse the outcome and findings regarding the anonymous complainants' complaints; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A THIRD CAUSE OF ACTION
**Violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution Pursuant to 42 U.S.C. § 1983: Gender Discrimination**

**(Against all Defendants)**

269.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

270.   Plaintiff is a male and is, therefore, a member of a protected class.

271.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mandates that "[n]o state shall… deny any person within its jurisdiction the equal protection of the law."

272.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is enforceable through 42 U.S.C. § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

273.   As set forth herein and above, Defendants subjected Plaintiff, the male respondent to differential treatment vis-à-vis female complainants and instructors on the basis of his gender by, among other things, (i) presuming Plaintiff guilty from the inception of the complaints against him due to his gender; (ii) using Plaintiff as a scape goat to appease female complainants after years of historical failure to

address complaints of sexual misconduct against males on campus; (iii) permitting female complainants to freely speak on campus regarding the allegations while essentially placing a gag order on Plaintiff; and (iv) refusing to allow Plaintiff to present relevant witnesses while not denying the same to the complainants.

274.   On information and belief, when Plaintiff was not permitted to teach his scheduled classes following the Title IX hearing, the majority of Plaintiff's classes were given to female instructors.

275.   Defendants, as well as other agents, representatives, and employees of Defendant Augusta, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

276.   Defendants all Defendant Reed to, approved, and ratified this unconstitutional conduct as described above.

277.   As a result of these constitutional violations, Plaintiff suffered, and continues to suffer, ongoing harm, including, but not limited to, damages to his reputation, loss of employment opportunities, severe emotional trauma, and other economic and non-economic damages.

278.   As a result of the foregoing, Plaintiff seeks damages against the individual defendants in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past

and future economic losses, loss of career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

279.   Plaintiff further seeks declaratory relief against Defendant Augusta's process under the Policies unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant as follows:

(i) On the first cause of action for Violation of Title IX of the Education Amendments of 1972 Erroneous Outcome, a judgment against Defendant BOR awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Augusta to: (a) reverse the outcome and findings regarding the anonymous complainants' complaints; (b) expunge Plaintiff's disciplinary record; (c) remove any record of the original Finding and Sanction from Plaintiff's file(s); and (d) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(ii) On the second cause of action for Violation of Title IX of the Education Amendments of 1972 retaliation, a judgment against Defendant BOR awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Augusta to: (a) reverse the outcome and findings regarding the anonymous complainants' complaints; (b) expunge Plaintiff's disciplinary record; (c) remove any record of the original Finding and Sanction from Plaintiff's file(s); and (d) issue an

update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(iii)     On the third cause of action against the individual defendants Defendant Reed, Defendant Hutton, Defendant Thorp, and Defendant Keel for violation to the Fourteenth Amendment of the United States Constitution: equal protection, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss career opportunities, together with prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     On the third cause of action against all Defendants in their official capacities for violation to the Fourteenth Amendment of the United States Constitution: equal protection, a declaratory judgment that declaring the Defendants' actions and Defendant Augusta's process under the Policies unconstitutional, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints; and

(v)  Such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted this 28th day of September 2021.

**Parks, Chesin, & Walbert, P.C.**

By: <u>/s/ Andrew Y. Coffman, Esq.</u>
    Andrew Y. Coffman, Esq.
    Georgia Bar No. 173115
    acoffman@pcwlawfirm.com
    75 14th Street, 26th Floor
    Atlanta, GA 30307
    Tel: 404-873-8000

**Nesenoff & Miltenberg, LLP**

By: /s/ Andrew T. Miltenberg, Esq.
    Andrew Miltenberg, Esq., *pro hac vice admission pending*
    New York Bar No. 2399582
    amiltenberg@nmllplaw.com
    Stuart Bernstein, Esq., *pro hac vice admission pending*
    New York Bar No. 2371953
    SBernstein@nmllplaw.com
    Kristen Mohr, Esq., *pro hac vice admission pending*
    Wisconsin Bar No. 1116865
    kmohr@nmllplaw.com
    363 Seventh Avenue, 5th Floor
    New York, New York 10001
    Tel: 212-736-4500
    Fax: 212-736-2260

    ***Attorneys for Plaintiff***