## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| THOMAS CROWTHER, | |
|      Plaintiff, | |
| v. | Civil Action No. 1:21-cv-04000-VMC |
| BOARD OF REGENTS OF THE UNIVERISTY SYSTEM OF GEORGIA, MICHELE REED, SCOTT THORP, BENJAMIN HUTTON, and BROOKS KEEL, | |
|      Defendants. | |

## ORDER

Before the Court is the Motion of the Board of Regents of the University System of Georgia ("BOR") and Defendants Scott Thorp, Benjamin Hutton, and Brooks Keel, in their official and individual capacities, to Dismiss Plaintiff's Complaint ("BOR MTD," Doc. 32), and the Motion of Michelle Reed to Dismiss ("Reed MTD," Doc. 33). For the reasons that follow, the Court will grant in part and deny in part the BOR MTD and will grant the Reed MTD.

## Background[1]

Plaintiff Thomas Crowther taught Art courses at Augusta University ("Augusta" or "University") from 2006 to 2021. (Compl. ¶ 86, Doc. 1). Defendant Board of Regents consists of nineteen members who are responsible for establishing policies and rules that govern the University System. (*Id.* ¶ 13). Defendant Michelle Reed was at all relevant times Augusta's Title IX Coordinator. (*Id.* ¶ 14). Defendant Scott Thorp was at all relevant times the Chair of Augusta's Department of Art and Design.  (*Id.* ¶ 15). Defendant Benjamin Hutton was at all relevant times Augusta's Title IX Investigator. (*Id.* ¶ 16). Defendant Brooks Keel was at all relevant times Augusta's President. (*Id.* ¶ 17).

Mr. Crowther's classes included painting of various levels, drawing of various levels, world humanities, marvel of art, and 2D design. (*Id.* ¶ 86). He was promoted in February 2020 to Senior Lecturer. (*Id.* ¶ 88). As well as teaching art courses, Mr. Crowther also exhibits his art regularly. (*Id.* ¶ 89). His work focuses heavily on oil painting landscapes as well as the nude figure. (*Id.*). Due to the nature of his work, his classes often feature nude models, as is typical for such art courses. (*Id.* ¶ 90). On days when there was a model for the class, the model would go into the classroom and change into a robe in a separate room, and then would

---

[1] Because this case is before the Court on a Motion to Dismiss, the following facts are drawn from Plaintiff's Complaint and are accepted as true. *Cooper v. Pate*, 378 U.S. 546, 546 (1964).

go into the classroom where the students were ready to draw. (*Id.*). While drawing the model, students were directed to put their cell phones away for the remainder of the class. (*Id.*).

During one particular class, one of Mr. Crowther's students was struggling to draw a model's foot in the model's seated position. (*Id.* ¶ 91). After being asked for help, Mr. Crowther asked the model if he could take a picture from the student's view to assist her drawing. (*Id.* ¶ 92). The model consented to the photo being taken. (*Id.*). Mr. Crowther took the photo, blurred out the model's genitalia and face, showed the model the photo for her consent, and after the model consented, projected the photo onto the screen so that the student could trace the model's foot. (*Id.* ¶ 93). Mr. Crowther did not take any other pictures of the model on that occasion. (*Id.* ¶ 94).[2]

On February 21, 2020, a confidential tip was sent to the Augusta Police that Mr. Crowther had been using his cell phone to photograph nude art models during class, and this information was later forwarded to Ms. Reed and Mr. Thorp. (*Id.* ¶¶ 96–97).

---

[2] Mr. Crowther also alleges that he had only taken a picture of a model on one other occasion at that model's express request. (Compl. ¶ 95).

3

On March 2, 2020, Ms. Reed sent an email asking to meet with Mr. Crowther "regarding allegations" and stated that she "oversee[s] the Student Sexual Misconduct policy" and would "provide [Plaintiff] with due process." (*Id.* ¶ 96).

Mr. Crowther met with Ms. Reed on March 3, 2020, and she informed him about the allegations concerned touching students in class and taking photos of a nude model, against class policy. (*Id.* ¶ 100). She informed Mr. Crowther that he would receive her intake notes and summary of the interview and would be assigned investigators promptly. (*Id.* ¶ 102).

Mr. Crowther makes several allegations about learning about a "smear campaign" being orchestrated against him by students. (*Id.* ¶¶ 103–08). One student who reached out to him to warn him about the alleged campaign was put on his witness list for the investigation but was never interviewed. (*Id.* ¶ 109).

On March 11, 2020, Mr. Crowther reached out to Ms. Reed after not receiving the intake notes and summary she stated she would send. (*Id.* ¶ 110). Later that day, Ms. Reed emailed him her intake notes in an email that also designated Renee Wray and Debra Arnold as the unofficial investigators of the matter. (*Id.*) That same day, Mr. Crowther was approached by Mr. Thorp to inform Mr. Crowther that he was being placed on administrative leave with pay pending the outcome of the investigation. (*Id.* ¶ 111). He also received an email from the Dean of the College of Arts, Elna Green, confirming the administrative leave. (*Id.*

¶ 112). Mr. Thorp told Mr. Crowther that he was to immediately leave campus and not return, despite the fact that the University had been informed of the allegations weeks prior and had taken no interim action. (*Id.* ¶ 113).

On March 26, 2020, after Mr. Crowther had sent several forms of correspondence to which he not received responses, he received an email addressed to "Professor Thorp" from Ms. Reed, designating Renee Wray and Debra Arnold as the official investigators. (*Id.* ¶ 116–120). In this email, Ms. Reed included part of the misconduct policy which states "[w]here a case is not resolved through informal resolution, or informal resolution is not available, due to the nature of the charges, the matter will be heard through a hearing officer or a hearing panel." (*Id.* ¶ 121). The email also suggested that he submit a written statement and gather relevant documents and evidence. (*Id.* ¶ 122). Mr. Crowther prepared his statement and evidence and submitted the documents to the investigators on March 30. (*Id.* ¶ 123).

On March 31, 2020, Mr. Crowther received an email from Ms. Reed in which she stated that the two previously assigned investigators were not available due to an undisclosed conflict of interest and that she would be sending another letter designating new official investigators. (*Id.* ¶ 124). On April 6, 2020, Mr. Crowther received another email which designated Mr. Hutton and Justin Jerome as the new official investigators. (*Id.* ¶ 125).

On April 10, 2020, Ms. Reed emailed Mr. Crowther concerning his witness list, asking him to indicate the relevance of each witness. (*Id.* ¶ 126). Mr. Crowther promptly replied by email, indicating the relevance of his witnesses. (*Id.*). The University refused to disclose the identities of the individuals who made the complaints against Mr. Crowther, presumably to protect the witnesses from retaliation. (*Id.* ¶ 127). A group of students spoke to the investigators about their allegations, which Mr. Crowther maintains were false and lacking in credibility for various reasons. (*Id.* ¶¶ 128–135).

On April 22, 2020, Mr. Thorp contacted Mr. Crowther via email regarding his annual evaluation. (*Id.* ¶ 136). The evaluation not only mentioned the ongoing Title IX investigation, but also gave Mr. Crowther the lowest possible ratings in every category. (*Id.*). Mr. Thorp claimed that the ratings were due to a pattern of "improper behavior" by Mr. Crowther. (*Id.* at 138). Until that evaluation, Mr. Crowther had continuous, positive annual evaluations, as well as peer and student reviews, since his initial employment in 2006. (*Id.*).

Mr. Crowther submitted a rebuttal to the evaluation on May 4, 2020, citing his years of positive evaluations, but Mr. Thorp disregarded the rebuttal and stated that Mr. Crowther would not be needed to teach the summer classes he was scheduled to teach. Mr. Thorp then stated that he needed to have an "urgent" meeting with him. (*Id.* ¶ 139).

On May 8, 2020, Mr. Crowther had his meeting with Mr. Thorp and Dean Greene. In that meeting, Mr. Thorp stated that he was initiating the process to terminate Mr. Crowther with cause, and that he could resign or else he would be terminated. (*Id.* ¶ 146). Mr. Crowther alleges that Mr. Thorp cited a written "aide to memory" from ten years prior as well as the Departmental Life Model "Policy," neither of which were proper grounds for removal under the Board of Regents Policy. (*Id.* ¶ 147).

On May 13, 2020, Mr. Crowther had his initial investigatory meeting with Investigators Jerome and Hutton. (*Id.* ¶ 149). In the meeting, the investigators continued to refuse to disclose the identities of the complainants (*Id.* ¶ 150). On May 21, 2020, Mr. Crowther submitted an official grievance letter to the Grievance Committee detailing what he presumed was his termination after his termination meeting with Mr. Thorp. (*Id.* ¶ 151). However, the sub-committee's initial report stated that he could not "grieve" the termination because the termination had not yet come to pass. (*Id.*). The sub-committee stated that, in any event, only the President of the University could issue terminations. (*Id.*). On May 27, 2020, after submitting the grievance, Mr. Crowther noticed that close to $1,000 was missing from his paycheck. Mr. Crowther contacted Mr. Thorp, who stated that it was a "mistake." (*Id.* ¶ 152). On June 4, 2020, Mr. Crowther received an email from Assistant Provost, Kathy Browder, informing him that the faculty committee had

completed their review of Mr. Crowther's termination process initiated by Mr. Thorp. The faculty committee did not recommend termination, but rather recommended "further inquiry" into the matter.  (*Id.* ¶ 153).

Mr. Crowther provided the Investigators with the statements of at least three models, including the very model that he was alleged to have photographed, and the investigators interviewed one of them (though not the model in question) on June 9, 2020.  (*Id.* ¶ 157–161). He provided twenty-two more written statements that he contended refuted the complainants' allegations by stating that he did not act inappropriately with his students at any time. (*Id.* ¶ 162). However, the investigators declined to interview all twenty-two of these witnesses and deemed them irrelevant character witnesses. (*Id.*).

On June 19, 2020, Investigator Hutton emailed Mr. Crowther the Initial Title IX Report. (*Id.* ¶ 164). The report listed Professors Pacheco, Onofrio, and Mr. Thorp, University faculty mandatory reporters, as the complainants instead of the students who initially made the complaints. (*Id.*) The complaining students were listed as anonymous witnesses, as the University continued to refuse to disclose their identities. (*Id.*).

Mr. Crowther was given a three-business-day response deadline, which was not extended at his request. (*Id.* ¶ 165). He submitted a response, pointing out his perceptions of the complainants' inaccuracies and shortcomings. (*Id.* ¶ 173). On

8

June 30, 2020, he received the First Final Report, and on July 2, 2020, he received the Second Final Report. (*Id.* ¶¶ 176, 186). Throughout this time, Mr. Crowther pointed to further perceived shortcomings and inaccuracies. (*See generally id.*). On July 9, 2020, Mr. Crowther received a letter from Kim Davies, Interim Dean of the College of Arts, Humanities and Social Sciences, stating that he was suspended for the Fall 2020 semester due to a violation of the Sexual Harassment Policy. (*Id.* ¶¶ 188, 191). The letter did not give an explanation, but rather just said that based on the report, she agreed with the recommended one-semester suspension. (*Id.* ¶ 191).[3]

Mr. Crowther appealed the finding of responsibility to Augusta's Executive Vice President and Provost, but his appeal was denied. (*Id.* ¶¶ 195–96). He appealed again to Mr. Keel, President of Augusta on July 28, 2020, who again denied the appeal. (*Id.* ¶¶ 197–98). On August 19, 2020, Mr. Crowther submitted the final appeal of the decision to Legal Affairs but did not receive a response to his appeal. (*Id.* ¶ 199).

---

[3] Meanwhile, Mr. Crowther had submitted a records request for the student-complainants' names to university legal affairs on June 23, 2020. (*Id.* ¶ 170). On July 11, 2020, after the investigation ended, Mr. Crowther received a response from Legal Affairs concerning his information request, stating that because the investigation was closed, they could not provide the identities of the complainants. (*Id.* ¶ 193). Mr. Crowther accuses Legal Affairs of waiting to respond to him until the close of the investigation so that they would not be obligated to provide him with the names of the complainants. (*Id.* ¶ 194).

Although Legal Affairs still had not contacted Mr. Crowther regarding his appeal, Dean Davies emailed him on October 14, 2020, to notify him that his role as Senior Lecturer would not be renewed for the 2021-2022 school year. (*Id.* at 202). As such, Mr. Crowther was effectively terminated after the Spring 2021 semester while his appeal was still pending. (*Id.* at 202). That same day, he received a "Notice of Reassignment of Duties" which he characterizes as "essentially a demotion." (*Id.* ¶ 203–04). The reassignment letter referenced a 2020 memorandum which Mr. Crowther later learned cited five instances of his alleged prior behavior including

> (1) an incident dating back to 2010, which had been dealt with by Plaintiff signing an agreement with the school that was never violated, and had not even been brought up in annual evaluations in the ten years prior; (2) a 2019 Title IX investigation which was dismissed due to the fact that there was no evidence for the baseless claims; (3) the 2020 Title IX investigation; (4) violation of the Departmental Life Model Policy, which, as stated above, was not a policy that was ever adhered to nor were any faculty aware of; and (5) contact with a student witness in the 2020 Title IX investigation, which Plaintiff was completely unaware of as the student witnesses were anonymous.

(*Id.* ¶ 207).

10

Mr. Crowther also appealed his nonrenewal. (*Id.* ¶ 209–212). After some back and forth, Legal Affairs eventually denied both of his appeals. (*Id.* ¶ 213–19). This lawsuit followed.[4]

Mr. Crowther raises three Counts in his Complaint. Count I is a claim against BOR only for a violation of Title IX of the Education Amendments of 1972 ("Title IX") on an Erroneous Outcome theory. Count II is a claim against BOR only for a violation of Title IX on a retaliation theory. Count III is a claim against all defendants under 42 U.S.C. § 1983 ("Section 1983") for gender discrimination.

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true; however, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*,

---

[4] At some point, Mr. Crowther filed charges of employment discrimination with the Equal Employment Opportunity Commission (EEOC) and has stated that he intends to amend the Complaint to include relevant federal and state claims once he receives a right to sue notice. (Compl. at 4 n.1).

556 U.S. at 679. Although the plaintiff is not required to provide "detailed factual allegations" to survive dismissal, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678; *Twombly*, 550 U.S. at 555.

**Discussion**

The Court begins by discussing the Title IX claims against Defendant BOR and then discusses the Section 1983 claims against all Defendants.

**I.     Title IX Claims**

Mr. Crowther's first two claims are against BOR under Title IX. "The Supreme Court has recognized an implied right of action for money damages in Title IX cases of intentional sexual discrimination . . . ." *Doe v. School Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1254 (11th Cir. 2010). The Supreme Court has further held that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination" and thus "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174, (2005) (quoting 20 U.S.C. § 1681(a)) (emphasis in original).

### A.    Effect of Title VII

BOR first argues that claims under Title IX for employment discrimination are "preempted" by Title VII of the Civil Rights Act of 1964. (Br. Supp. BOR MSJ at 12, Doc. 32). While there is a circuit split on the issue (as discussed below), the Eleventh Circuit has not yet decided the issue. *Heatherly v. Univ. of Ala. Bd. of Trs.*, 778 F. App'x 690, 694 (11th Cir. 2019).

As an initial matter, strictly speaking, "this is not a pre-emption case." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014). "In pre-emption cases, the question is whether state law is pre-empted by a federal statute, or in some instances, a federal agency action." *Id.* (citing *Wyeth v. Levine,* 555 U.S. 555, 563 (2009).[5] "This case, however, concerns the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute." *Id.* The Supreme Court has held that while its "pre-emption precedent does not govern preclusion analysis . . . , its principles are instructive insofar as they are designed to assess the interaction of laws that bear on the same subject." *Id.* at 111–12.

The leading decision supporting the approach that Title VII bars employment claims under Title IX is the Fifth Circuit's decision in *Lakoski v. James,*

---

[5] Somewhat adding to the confusion, older Supreme Court cases appear to use the terms indistinguishably. *See e.g.*, *Great American Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976).

66 F.3d 751, 752 (5th Cir. 1995). As the *Lakoski* court noted, Title VII originally "exempted educational institutions from its coverage." *Id.* at 756. However, around the same time that Congress was considering what eventually became Title IX, Congress passed the Equal Employment Opportunity Act of 1972, "which removed Title VII's exemption for educational institutions as well as extend[ed] Title VII's coverage to state and local government employees." *Id.* at 757. As the court noted, original drafts of what would become Title IX originally proposed to remove the education exemption, but that language was dropped from later versions in light of the intervening law change. *Id.* The Fifth Circuit examined the similarity of the laws and concluded "[t]hat Congress intended to create a bypass of Title VII's administrative procedures so soon after its extension to state and local governmental employees is an extraordinary proposition," especially where "Congress enacted Title IX only months after extending Title VII to state and local governmental employees." *Id.* at 756.

The Fifth Circuit also looked to other cases where the Supreme Court held that Title VII's carefully drawn administrative procedures precluded a more general claim targeting the same conduct. *Id.* at 755 (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976)). For example, in *Great American*, "the Court held that Title VII preempts § 1985 actions alleging violations of Title VII rights, [noting that] '[i]f a

14

violation of Title VII could be asserted through § 1985(3), a complainant could avoid most if not all of [Title VII's] detailed and specific provisions of the law [and] . . . could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII.'" *Id.* at 755 (citing 422 U.S. at 375–376). Similarly, it noted that the Supreme Court in *Brown* "held that Title VII provides the exclusive judicial remedy for federal employees' claims of employment discrimination." *Id.* (citing 425 U.S. at 834).

The Third Circuit took the opposite approach in *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 560 (3d Cir. 2017), holding that "Title VII's concurrent applicability does not bar [plaintiff's] private causes of action for retaliation and quid pro quo harassment under Title IX." The Third Circuit recognized that cases such as *Brown* precluded federal employment discrimination claims under other statutes, but distinguished those cases and pointed to other cases where the Supreme Court permitted similar federal anti-discrimination claims to proceed in an employment context. *Id.* at 560–60 (citing *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 461 (1975)). For example, it noted that in *Johnson*, the Court observed that "remedies available under Title VII and under § 1981 [for race discrimination], although related, and although directed to most of the same ends, are separate, distinct, and independent." *Id.* at 560 (citing 421 U.S. at 461). In that case, the Court explained that "Title VII 'manifests a congressional intent to allow an individual

15

to pursue independently his rights under both Title VII and other applicable' federal statutes." *Id.* (quoting 421 U.S. at 461).

The Third Circuit also pointed to the Supreme Court's decision in *North Haven Board of Education v. Bell*, 456 U.S. 512 (1982). *Id.* at 561. In that case, the Supreme Court upheld "regulations interpreting Title IX to extend to sex-based employment discrimination," and in doing so, "rejected the argument that Title IX shouldn't extend to private employment because employees have 'remedies other than those available under Title IX,' like Title VII. *Id.* (quoting 456 U.S. at 516, 535 n.26) ("Even if 'alternative remedies are available and their existence is relevant," it rejoined, 'Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination.'").

Perhaps most significantly, the Third Circuit pointed to the Supreme Court's decision in *Jackson*, which recognized a Title IX retaliation claim in the employment context and post-dated the Fifth Circuit's decision in *Lakoski*. *Mercy Cath.*, 850 F.3d at 562 (citing 544 U.S. 167).[6]

---

[6] However, courts have distinguished *Jackson* on the grounds that the Title IX retaliation claim recognized in that case would not have been available under Title VII. *Kavianpour v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 1:20-cv-00152-MLB-RGV, 2021 WL 2638999, at *18 n.24 (N.D. Ga. Jan. 28, 2021), *report and recommendation adopted on other grounds*, 2021 WL 2635854 (N.D. Ga. Mar. 29, 2021).

Courts in this district have tended to follow the *Lakoski* approach. *Reese v. Emory Univ.*, No. 1:14-CV-2222-SCJ, 2015 WL 13649300, at *5 (N.D. Ga. Jan. 29, 2015); *Cooper v. Bd. of Regents of the Univ. of Ga.*, No. 1:16-cv-01177-TWT-JFK, 2017 WL 1370769, at *1 (N.D. Ga. Feb. 22, 2017), *report and recommendation adopted*, 2017 WL 1354819 (N.D. Ga. Apr. 13, 2017); *Joseph v. Bd. of Regents of Univ. Sys. of Ga.*, No.. 1:20-cv-502-TCB, 2020 WL 6494202, at *4 (N.D. Ga. May 8, 2020)[7]; *Kavianpour v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 1:20-cv-00152-MLB-RGV, 2021 WL 2638999, at *18 n.24 (N.D. Ga. Jan. 28, 2021), *report and recommendation adopted on other grounds*, 2021 WL 2635854 (N.D. Ga. Mar. 29, 2021); *Wainberg v. Piedmont Coll.*, No. 2:19-cv-00251-MHC, slip op. at 50 (N.D. Ga. Mar. 7, 2023), ECF No. 194.

However, some recent academic commentary has favored the Third Circuit's approach. *See, e.g.,* Lynn Ridgeway Zehrt, *Title IX and Title VII: Parallel Remedies in Combatting Sex Discrimination in Educational Employment*, 102 Marq. L. Rev. 701 (2019); Kim Turner, *The Rights of School Employee-Coaches Under Title VII and Title IX in Educational Athletic Programs*, 32 ABA J. Lab. & Emp. L. 229 (2017); *but see* Alicia Martinez, *Following the Fifth Circuit: Title VII As the Sole Remedy for Employment Discrimination on the Basis of Sex in Educational Institutions Receiving Federal Funds*, 27 Am. U. J. Gender Soc. Pol'y & L. 73, 76 (2018).

---

[7] The decision in *Joseph* was issued before reassignment of that case to the undersigned. The Court was later faced with the opposite issue: under what circumstances Title IX violations may support a Title VII claim.

The Court ultimately resolves this split in authority by beginning where it started: the Supreme Court's principles of federal statutory preclusion. *POM Wonderful*, 573 U.S. at 111–12. ("Although the Court's pre-emption precedent does not govern preclusion analysis in this case, its principles are instructive insofar as they are designed to assess the interaction of laws that bear on the same subject."). "[T]his is a statutory interpretation case and the Court relies on traditional rules of statutory interpretation. That does not change because the case involves multiple federal statutes." *Id*. at 122 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137–139 (2000)).

First, nothing in Title VII "in express terms, forbids or limits" Title IX employment discrimination claims. *Id.* at 113. On the contrary, its preemption provision broadly allows for state laws that provide greater protection. 42 U.S.C. § 2000e-7 ("Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter."); *cf. POM Wonderful*, 573 U.S. at 114 ("By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the FDCA to preclude requirements arising from other sources.").

Second, Congress has taken no action in the 40 years since the Supreme Court approved the Department of Education's regulation of employment in higher education, despite the EEOC's concurrent jurisdiction. *N. Haven*, 456 U.S. at 520, 534–45 (discussing congressional inaction in response to HEW regulations); *cf. POM Wonderful*, 573 U.S. at 112 (quoting *Wyeth v. Levine*, 555 U.S. 555, 575 (2009)) ("This is 'powerful evidence that Congress did not intend FDA oversight to be the exclusive means' of ensuring proper food and beverage labeling.").

Finally, looking to the structure of the statutes, the Court finds that they complement each other. *POM Wonderful*, 573 U.S. at 115. (citing *J.E.M. Ag Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001); *Wyeth*, 555 U.S. at 578–579) ("When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other."). For example, while Congress tasked EEOC with remedying private employment discrimination through conciliation and, where appropriate, individual enforcement actions, the Supreme Court has already recognized that Congress allowed for more proactive enforcement actions targeting employment discrimination against recipients of federal education funding by the Department of Education and its predecessor agency. *Contra N. Haven*, 456 U.S. at 552–53 (Powell, J., dissenting) ("Title VII is a comprehensive antidiscrimination statute with carefully prescribed procedures

for conciliation by the EEOC . . . in sharp contrast to Title IX, which contains only one extreme remedy, fund termination . . . . Congress delegated the administration of Title IX to the Department of HEW. In contrast, Title VII and the Equal Pay Act are administered by the Department of Labor and EEOC."). Similarly, it is not unreasonable to assume that Congress would have a special interest in ensuring that recipients of federal educational funding be compensated for harm suffered from discrimination. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979) ("Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes."). That this objective overlaps with Congress's objective of curbing workplace discrimination writ large does not imply that one remedy excludes the other. *Cf. Johnson*, 421 U.S. at 465–66 ("But the fundamental answer to petitioner's argument lies in the fact—presumably a happy one for the civil rights claimant—that Congress clearly has retained § 1981 as a remedy against private employment discrimination separate from and independent of the more elaborate and time-consuming procedures of Title VII."). Accordingly, the Court holds that Title VII does not preclude employment discrimination claims under Title IX.

### B.    Pleading Standards

Next, BOR argues that Mr. Crowther does not plead a prima facie case of

sex discrimination. Specifically, BOR argues that Mr. Crowther does not plead the

existence of a comparator under the *McDonnell Douglas* framework. (Br. Supp.

MTD at 22) (citing *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1221 (11th Cir.

2019). In response, Mr. Crowther argues that because his sex discrimination claim

is premised on an "erroneous outcome" theory, the *McDonnell Douglas* pleading

standards do not apply.

Courts in this circuit as well as out-of-circuit appeals courts have held that

a Title IX sex discrimination claim can be premised on a so-called "erroneous

outcome theory." *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1339 n.2 (S.D. Fla.

2017) (collecting cases). These courts tend to follow the Second Circuit's

framework established in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994). "The

Second Circuit held in Yusuf that Title IX 'bars the imposition of university

discipline where gender is a motivating factor in the decision to discipline,'" and

"identified two general categories of Title IX challenges to university disciplinary

proceedings." *Lynn Univ*, 235 F. Supp. 3d at 1339 (quoting *Yusuf*, 35 F.3d at 715).

> Some plaintiffs allege that, guilt or innocence aside, the
> student's gender affected the penalty imposed, the
> decision to initiate the proceeding, or both—these are
> selective enforcement challenges. Other plaintiffs allege
> that gender bias played a role in the wrongful conviction

of an innocent student—these are erroneous outcome
challenges.

*Id.* (citing *Yusuf*, 35 F.3d at 715) (internal citations omitted). For the latter category
of cases, "*Yusuf* provides that a plaintiff bringing an erroneous outcome challenge
must plead two elements: (1) facts sufficient to cast doubt on the accuracy of the
proceeding and (2) a causal connection between the flawed outcome and gender
bias." *Id.* (citing *Yusuf*, 35 F.3d at 715). The Eleventh Circuit has not expressly
adopted this pleading standard, but in *Doe v. Valencia College*, 903 F.3d 1220, 1236
(11th Cir. 2018), it "assume[d] for present purposes that a student can show a
violation of Title IX by satisfying the 'erroneous outcome' test applied by the
Second Circuit in *Yusuf*."

For the purpose of pleading a violation of Title IX, the Court will likewise
assume that meeting the *Yusuf* standard is sufficient. That is to say, the Court will
assume for present purposes that pleading facts sufficient to cast doubt on the
accuracy of the proceeding as well as a causal connection between the outcome
and gender bias is sufficient to raise a plausible inference that a Title IX violation
occurred. The Court reserves the question of what evidence is necessary to prove
a Title IX violation on an erroneous outcome theory for a motion for summary
judgment or trial.

The Court finds that Mr. Crowther has stated a claim under *Yusuf*. Mr.
Crowther has pled that he provided the investigators with a statement from the

model that he was alleged to have photographed leading to the investigation, but the Investigators did not even interview her. (*Id.* ¶ 157-161). Moreover, to the extent that the investigation was later broadened into a more general investigation of his propensity for sexual harassment, he was entitled to put forward some evidence of his character to the contrary. However, "none of the witnesses that Plaintiff had named in his response to the Initial Report were interviewed. Rather, all but [former model] ML were named as irrelevant character witnesses. ML, on the other hand, while not 'irrelevant,' was not interviewed by the Investigator." (*Id.* at 177). Thus, the Court finds that Mr. Crowther has met his pleading burden on the first *Yusuf* prong.

As to the second prong, Mr. Crowther first points to several instances of Defendants promoting narratives aimed at curbing sexual harassment and assault against women, including on social media. However, the Court is not willing to skew this innocuous sentiment that is likely shared by most educators into evidence of bias against men. Mr. Crowther also points to a 2011 Dear Colleague Letter from the Department of Education's Office for Civil Rights and follow-up 2014 Q&A for evidence that there was "pressure on Augusta from the federal government." (Resp. at 12; Compl. ¶¶ 25–46). But if the Court were to adopt this line of logic, it would mean nearly every Title IX investigation in a four- to six-year period would be subject to scrutiny.

Ultimately, the Court must focus on the facts of *this* case, rather than the larger national political debate, to determine whether Mr. Crowther has met his pleading standard. There are a couple of facts present here which "nudge[] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. First, the majority of Mr. Crowther's classes were reassigned to female instructors. (*Id.* ¶ 192); *Cf. Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (holding, in Title VII context, that replacement by someone outside the protected class can establish a prima facie case of discrimination).

Second, he alleges that after the investigation commenced, he received the lowest possible ratings in his annual evaluation, despite the fact that the investigation had not yet been adjudicated. (Compl. ¶ 136–138). Moreover, he was pressured to resign prior to the outcome of the investigation. (*Id.* ¶ 146). This lends credence to Mr. Crowther's allegations that he was targeted for reasons other than the outcome of the investigation.

Finally, Mr. Crowther has alleged that Defendants applied university policies in a manner that resulted in harsher penalties for males accused of sexual misconduct as compared to females.[8] The Second Circuit found this allegation, properly contextualized, was sufficient to proceed with a complaint under Title

---

[8] Mr. Crowther recognizes that he will need to substantiate this allegation with evidence through discovery going forward. (Compl. ¶ 55 n.13).

IX. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 716 (2d Cir. 1994) (Finally, he asserts that males accused of sexual harassment at Vassar are "historically and systematically" and "invariably found guilty, regardless of the evidence, or lack thereof."). For all of these reasons, the Court finds that Mr. Crowther has stated a claim for Title IX discrimination on an erroneous outcome theory.

Likewise, the Court finds that Mr. Crowther has stated a claim for retaliation, because, among other reasons, Mr. Crowther alleged he was pressured to resign after having engaged in protected activity by defending himself against the Title IX charges. *Cf. Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (forcing a resignation by "coercion or duress" is adverse employment action).

## C.    Prospective Relief

Finally, BOR claims Mr. Crowther's claims for injunctive relief are barred by the Eleventh Amendment. Specifically, BOR points to Mr. Crowther's requests that BOR "reverse the outcome and findings of the Title IX investigation; to expunge his disciplinary record; to remove any mention of the investigation from his files; and to 'issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.'" (Br. Supp. BOR MSJ at 14) (citing Compl.).

Injunctive relief is available under the implied cause of action under Title IX recognized by *Cannon*. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (citing *Cannon,* 441 U.S. at 717). Nevertheless, BOR asserts that it is immune from such relief in this case, pointing to Judge Cohen's decision in *Go v. Board of Regents*, No. 1:18-cv-0233-MHC (N.D. Ga. Nov. 1, 2018). But *Go* was not a Title IX case. BOR is not immune from claims under Title IX because in accepting federal funds under Title IX "[BOR] waived its Eleventh Amendment sovereign immunity." *Pederson v. La. State Univ.*, 213 F.3d 858, 876 (5th Cir. 2000); *see also* 42 U.S.C. § 2000d–7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title IX of the Education Amendments of 1972."). The Court addresses the remainder of BOR's arguments relating to injunctive relief below in its discussion about Mr. Crowther's Section 1983 claims, but will deny the BOR MTD as to the Title IX claims.

## II.    Section 1983 Claims

Count III of Mr. Crowther's Complaint raises Section 1983 claims against all Defendants. "To prevail on a claim under § 1983, a plaintiff must demonstrate both (1) that the defendant deprived her of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." *Arrington v. Cobb Cty.*, 139 F.3d 865, 872 (11th Cir. 1998) (citing *Willis v. Univ. Health*

26

*Serv.*, 993 F.2d 837, 840 (11th Cir. 1993)). "One such law is the Equal Protection Clause, U.S. Const. amend. XIV, § 1, which confers a federal constitutional right to be free from sex discrimination." *Hill v. Cundiff*, 797 F.3d 948, 976 (11th Cir. 2015) (citations omitted); see also *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1302 (11th Cir. 2007) (citation omitted) ("The Equal Protection Clause confers a federal constitutional right to be free from sex discrimination."); *Venice v. Fayette Cty.*, No. 3:09-cv-35-JTC, 2010 WL 11507614, at *2 (N.D. Ga. Sept. 16, 2010) (citation omitted) ("[T]he Equal Protection Clause of the United States Constitution[ ] prohibits unlawful sex discrimination in public employment."). "In order to establish a violation of the Equal Protection Clause, appellees must prove discriminatory motive or purpose." *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 (5th Cir. 1980)).

The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike. *Glenn v. Brumby*, 632 F. Supp. 2d 1308, 1312 (N.D. Ga. 2009), *aff'd,* 663 F.3d 1312 (11th Cir. 2011) (citation and quotation omitted); see also *Hossain v. Steadman*, 855 F. Supp. 2d 1307, 1312 (S.D. Ala. Jan. 25, 2012) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)) ("The mandate of the Equal Protection Clause essentially 'is that all persons similarly situated should be treated alike.'"). "In order to state an equal protection claim,

the plaintiff must prove that he was discriminated against by establishing that other similarly-situated individuals outside of his protected class were treated more favorably." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1180 (11th Cir. 2009); *see also Jarrett v. Alexander*, 235 F. Supp. 2d 1208, 1212 (M.D. Ala. 2002) (citation omitted) (explaining that to survive a motion to dismiss on an equal protection sex discrimination claim against a defendant in his individual capacity, "the Plaintiff[] still must show that [she was] treated differently from others similarly situated.").

All Defendants seek dismissal of Mr. Crowther's Section 1983 claims.[9] First, they assert that as to claims for monetary relief against BOR and the individual defendants in their official capacity, no remedy is available under Section 1983. *See, e.g., Nicholl v. Bd. of Regents of the Univ. Sys. of Ga.*, 706 F. App'x 493, 495 (11th Cir. 2017). Mr. Crowther does not appear to contest this assertion, and the Court agrees as well. As such, the Court will grant the motion to the extent it seeks dismissal of these claims. Next, the individual defendants in their individual capacity seek dismissal of the claims for monetary relief on qualified immunity grounds, which the Court addresses in the following section. Lastly, the BOR and the individual defendants in their official capacity seek dismissal of the claims for injunctive relief pursuant to *Ex Parte Young* and the Eleventh Amendment.

---

[9] The Court disagrees with Defendant Reed that the Complaint is a "shotgun pleading."

28

### A.      Qualified Immunity

"A district court must dismiss a complaint under Fed. R. Civ. P. 12(b)(6) when the complaint's allegations, on their face, show that an affirmative defense bars recovery on the claim." *Nichols v. Maynard*, 204 F. App'x 826, 828 (11th Cir. 2006). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To claim qualified immunity, the defendant must first show he was performing a discretionary function. *Moreno v. Turner*, 572 F. App'x 852, 855 (11th Cir. 2014). The parties do not appear to dispute that the individual defendants were performing a discretionary function with respect to the allegations in the complaint.

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Edwards v. Shanley*,

666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).

The plaintiff demonstrates that qualified immunity does not apply by showing "(1) the defendant violated a constitutional right, and (2) th[e] right was clearly established at the time of the alleged violation." *Moreno*, 572 F. App'x at 855 (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009)). The "clearly established" requirement may be met by one of three showings: (1) a materially similar case has already been decided; (2) an accepted general principle should control the novel facts of the case with obvious clarity; or (3) the conduct in question so obviously violated the Constitution that no prior case law is necessary. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204–05 (11th Cir. 2012).

Defendants assert that there is no law on point that clearly establishes that their actions and application of their Title IX policies and procedures were in violation of Mr. Crowther's right to equal protection. Mr. Crowther largely appears to concede this, focusing his response brief on his claims for injunctive relief. The Court agrees that Mr. Crowther has not met his burden of showing that the individual defendants were on notice that their actions were allegedly unconstitutional. As such, the Court will grant the BOR MTD and Reed MTD on this ground.

### B.   Injunctive Relief

Mr. Crowther's Section 1983 count seeks "an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints." (Compl. ¶ 279). Defendants assert that that this relief is barred by the Eleventh Amendment, but the Court finds that these claims must be dismissed for a different reason: Mr. Crowther lacks standing to pursue such claims.

"Because standing is a jurisdictional requirement," the Court "must address [it] sua sponte," even if a party fails to raise it. *Klos v. Paulson*, 309 F. App'x 322, 323 n.1 (11th Cir. 2009). "As an irreducible minimum, Article III requires a plaintiff to meet three standing requirements." *Williams*, 477 F.3d at 1302 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Kelly v. Harris*, 331 F.3d 817, 819–20 (11th Cir. 2003)). "First, the plaintiff must show that she has suffered an injury-in-fact." *Id.* (citing *Lujan*, 504 U.S. at 560). "The plaintiff must show that the alleged injury arises from the invasion of a legally protected interest that is sufficiently concrete and particularized, and not abstract and indefinite. *Id.* (citing *Lujan*, 504 U.S. at 560). "Second, the plaintiff must establish a causal connection between the asserted injury-in-fact and the challenged action of the defendant." *Id.* (citing *Lujan*, 504 U.S. at 560). "Third, the plaintiff must show that it is likely, rather than speculative, "that a favorable decision will redress her injury." *Id.* (citing *Lujan*,

504 U.S. at 561). "Additionally, '[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury.'" *Id.* at 1302–03 (quoting *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001)).

Mr. Crowther no longer works at Augusta and does not seek reinstatement as a remedy. (*See generally Compl.*).[10] Therefore, the threat of future harm to Mr. Crowther by BOR continuing to enforce allegedly unconstitutional policies is too remote to confer standing. *See Williams*, 477 F.3d 1282, 1303 ("Williams no longer attends UGA. Williams alleges that if UGA adopts an equal and more protective sexual harassment policy—presumably the one she asks this court to order—she may pursue undergraduate or graduate studies at UGA. Furthermore, she alleges that in the absence of such a policy, the current students at UGA who are the victims of student-on-student harassment suffer from prohibited inequality. Williams's claim that an equal and more protective sexual harassment policy would prevent future harm is too conjectural to warrant injunctive relief.")

---

[10] The Court does not read the Complaint's request for a "revers[al of] the outcome and findings regarding the anonymous complainants' complaints" as a request for reinstatement, but rather a request that BOR vacate the findings of responsibility made following the investigation.

Accordingly, the Court will dismiss the Section 1983 claims for injunctive relief as well.

### Conclusion

In summary, the Court allows all of Mr. Crowther's Title IX claims to proceed, but dismisses Mr. Crowther's Section 1983 claims for both monetary and injunctive relief. Mr. Crowther has indicated an intent to amend his Complaint to add a Title VII claim. In light of the circuit split regarding Title VII preclusion of Title IX employment claims, it may be in his interest to do so. Accordingly, Plaintiff is directed to file a status report regarding the progress of the EEOC proceedings, including any expected deadlines for the EEOC to act under 42 U.S.C. § 2000e-5(f)(1), within fourteen days of the date of entry of this Order. Upon receipt of the status report, the Court will enter an order directing further action. Until such time, the Court will stay all proceedings in this case, including the Defendant BOR's answer deadline.

For the reasons the Court gave above, it is

**ORDERED** that Motion of the Board of Regents of the University System of Georgia ("BOR") and Defendants Scott Thorp, Benjamin Hutton, and Brooks Keel to Dismiss Plaintiff's Complaint (BOR Doc. 32) is **GRANTED IN PART** as to Count III of the Complaint and **DENIED IN PART** in all other respects. It is

**FURTHER ORDERED** that Motion of Michelle Reed to Dismiss Plaintiff's Complaint (Doc. 33) is **GRANTED**. It is

**FURTHER ORDERED** that the Clerk is **DIRECTED** to drop Defendants Scott Thorp, Benjamin Hutton, Brooks Keel, and Michelle Reed as parties in this case. It is

**FURTHER ORDERED** that this case is **STAYED** pending further Order of the Court. Plaintiff is **DIRECTED** to file a status report within fourteen days of the date of entry of this Order.

**SO ORDERED** this 15th day of March, 2023.

Victoria Marie Calvert
United States District Judge